UNITED STATES of America, Appellee,

v.

**Heinz GOLITSCHEK,**
**Defendant-Appellant.**

**No. 262, Docket 86–1168.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 5, 1986.

Decided Dec. 19, 1986.

---

Mark J. Mahoney, Buffalo, N.Y. (Prof. M. Cherif Bassiouni, Chicago, Ill., Edmund L. Schofield, Toronto, Canada, Diebold, Bermingham, Gorman, Brown & Cook, Buffalo, N.Y., on the brief), for defendant-appellant.

Kathleen M. Mehltretter, Asst. U.S. Atty., Buffalo, N.Y. (Roger P. Williams, U.S. Atty., Buffalo, N.Y., on the brief), for appellee.

Jeffrey M. Herrmann, New York City (Hans Harnik, Wachtell, Manheim & Grouf, New York, N.Y., on the brief), for amicus curiae Republic of Austria.

Before FEINBERG, Chief Judge, NEWMAN and MINER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal from a conviction for offenses relating to a planned shipment of helicopters from the United States to Iran raises a host of perplexing issues. The issues arise in an unusual context: The defendant is an Austrian citizen who never set foot in this country during the entire episode alleged to constitute his offense, and the offense concerns a fictitious sale that was proposed to the defendant by agents of the United States and never consummated. The appeal is brought by Heinz Golitschek from a judgment of the District Court for the Western District of New York (John T. Elfvin, Judge) convicting him, after a jury trial, of conspiracy to violate 22 U.S.C. § 2778(b)(2), (c) and 18 U.S.C. § 1001 and to defraud the United States, in violation of 18 U.S.C. § 371, and wire communications fraud, in violation of 18 U.S.C. § 1343. Golitschek was sentenced to concurrent prison terms of three and one-half years, which he is now serving.

For reasons that follow, we have concluded that the conviction must be reversed because of erroneous instructions concerning the defendant's knowledge. Whether the Government is entitled to retry the defendant depends on resolution of various issues, as to some of which we would find it helpful to have an expression of views from the United States Department of State. Because the defendant has been in custody since his arrest in Canada on October 30, 1985, we have concluded that at this point we will promptly enter a partial judgment reversing the conviction and remanding to the District Court for the limited purpose of setting reasonable conditions of bail. We will retain jurisdiction of the appeal so that, in the event that the Government advises us of its intention to retry the defendant, we can subsequently resolve those issues that bear on the lawfulness of a retrial.

## I.

Before setting forth the pertinent fact, it will be helpful to summarize the statute, regulations, and forms pertinent to the exports of arms. Section 38(a)(1) of the Arms Export Control Act (AECA) authorizes the President to control the export of "defense articles" and to issue the United States Munitions List, designating items considered to be "defense articles." 22 U.S.C. § 2778(a)(1) (1982). The List includes helicopters. 22 C.F.R. § 121.1, Category VIII(a) (1986). Section 38(b)(2) of AECA prohibits the export of defense articles without a license issued in accordance with the Act and regulations promulgated thereunder. 22 U.S.C. § 2778(b)(2) (1982). Section 38(c) of AECA authorizes punishment of up to ten years in prison and a fine of $1,000,000 for any person who "willfully" violates any provision of section 38. 22 U.S.C.A. § 2778(c) (West Supp.1986).

Regulations of the Department of State require any person exporting defense articles to obtain a license from the Department's Office of Munitions Control. 22 C.F.R. § 123.1(a) (1986). Applications for licenses must be made on Form DSP-5. *Id.* § 123.22(a). This form calls for identification of the "Country of Ultimate Destination" and the "Name and Address of Foreign end-user." An application for a license to export "significant military equipment" (defined to include helicopters, *id.* § 120.19(b)) must include a "nontransfer and use certificate (Form DSP-83)." *Id.* § 123.10(a). This certificate must be signed by the foreign consignee and the foreign "end user," and both must stipulate that, unless authorized by prior written approval of the State Department, they "will not reexport, resell or otherwise dispose of the significant military equipment enumerated in the application outside the country named as the location of the foreign end-use." *Id.* This certificate is frequently referred to as an "end-user certificate," an "EUC," an "EU," or an "end-user."

The State Department's regulations also provide that it is the policy of the United States to deny licenses to export defense articles to specified Communist countries and to "countries or areas with respect to

which the United States maintains an arms embargo or whenever an export would not otherwise be in furtherance of world peace and the security and foreign policy of the United States." *Id.* § 126.1(a). On April 7, 1980, President Carter embargoed the export of all items to Iran, except food, medicine, and clothing, Exec.Order No. 12,205, *reprinted in* 50 U.S.C.A. § 1701 note, at 244–45 (West Supp.1986), but this embargo was revoked on January 19, 1981, just prior to the release of the American hostages held by Iran, Exec.Order No. 12,282 § 1–101, *reprinted in* 50 U.S.C.A. § 1701 note, at 252. At Golitschek's trial, an official of the State Department's Office of Munitions Control testified that, as a matter of policy, the Department has determined that Iran has not been an acceptable end-user for items on the Munitions List since November 28, 1979.

## II.

The arrest of Heinz Golitschek resulted from an undercover "sting" operation conducted by the United States Customs Service in Buffalo, New York. Special Agent Walter Kiniry posed as Walt King, a partner in a supplier of military arms and equipment known as ESAK Enterprises. Kiniry came into contact with Stephen Reiter, a West German interested in buying weapons. Ultimately, in September 1985, Reiter was arrested and agreed to cooperate with the Government. Reiter telephoned his contact in West Germany, a man named Roesch. Subsequently Roesch referred Reiter to Golitschek as a person who was interested in buying military helicopters. Reiter telephoned Golitschek in Vienna, Austria. After ascertaining that Golitschek spoke English, Reiter handed the phone to Agent Kiniry, who conducted all subsequent discussions with Golitschek.

From October 17 to 29, 1985, Kiniry called Golitschek in Austria on twelve occasions, and Golitschek called Kiniry three times. These three calls from Austria to the United States would form the basis for the Government's assertion of federal jurisdiction over Golitschek's offenses.

In the very first call on October 17, Golitschek acknowledged that he had been in touch with Roesch almost daily during the preceding two to four weeks and was completely familiar with Kiniry's proposal to sell ten helicopters for "a special country," subsequently identified as Iran, at a price of $61 million. Kiniry claimed that his firm was reluctant to do business with Roesch and pursued the possibility that Golitschek would replace Roesch as the broker for the helicopter transaction.

Of special significance to the issue that is dispositive at this stage of this appeal is the discussion in this first and subsequent conversations concerning the documents necessary to accomplish the transaction, especially the end-user certificate. Kiniry made the first reference to documents when he referred to a proposed deal with Roesch for sale of TOW missiles "we were going to use a Brazilian EUC." This led to the following exchange with respect to the proposed helicopter sale:

Golitschek: ... I have even the end user, everything

Kiniry: my understanding is its Spanish

Golitschek: ya that's right and everything is clear with the bankers in Switzerland everything they accept the end user they accept everything is clear you know [1]

It would be Golitschek's contention at trial that he thought that the end-user document was an import license obtained by the importing company, and that this document would have to be presented to whatever bank would issue a letter of credit for the financing of the transaction.

Kiniry endeavored to alert Golitschek to the fact that an end-user certificate would have to be presented to the State Department:

Kiniry: ok the other problem that we're going to face is presenting the EUC to

---

**1.** This and all subsequent excerpts from taped conversations are rendered as they appear in the transcriptions, without corrections of spelling or punctuation.

the state department a there will be some delay there.

Golitschek: You mean they dont want to accept the Spanish AU [both sides agree that "AU" is the transcriber's phonetic rendering of Golitschek's pronunciation of "EU"]

Kiniry: oh I dont know that but it takes them some time to process any license request even if it were a Canadian EUC

Concerning the lawfulness of the transaction, this exchange occurred:

Kiniry: ... well as you're well aware there's no way that we could legally sell these units for the country you want them for

Golitschek: ya

In a phone call on October 22, however, Kiniry tells Golitschek: "Well we've checked it and Canada has ... See Canada has no law against this type of deal." Later in that conversation this exchange occurred:

Golitschek: If everything is legal there's no reason ah ah to be angry or to be ya to be worried about

Kiniry: Well, of course everything isn't legal that's our problem ah

Golitschek: You mean everything is legal

Kiniry: No, to sell these things to a special country that

Golitschek: I know but ah the official country is ah Spain no problem. We have the same

Kiniry: Well if that's where they were actually going there would be no difficulty but given the circumstances we've got if the authorities are watching ah you know it ... [ellipsis in original]

Golitschek: Ya you know I understand but ah ah only to come with the contract in your pocket ah to Zurich there is nothing to to no problem

Later Kiniry suggests that Golitschek come to Canada for a meeting. In a phone call the day before the planned meeting Kiniry asks: "is it possible to bring a copy of the EUC?" Golitschek replies, "that's too short for the moment." At trial he explained that he meant there was not enough time to obtain the papers he was referring to.

Golitschek arrived in Toronto on October 30 and held a conversation with Kiniry that was videotaped. In this conversation, Golitschek again referred to the end-user certificate in relation to the Swiss bank: "... a Spanish end user ah, is a good one O.K. so it means ah, even this the Swiss bank ... they accept the Spanish end user."

This conversation also touched on unlawfulness and the possibility that accomplishing the arms deal would be lawful in Canada:

Kiniry: ... in the States it's, it's a five year criminal punishment for doing this type ... if the people in the States find out they went to Iran. Its not good for us here.

Golitschek: I understand, I understand heh heh

.　　.　　.　　.　　.

Kiniry: Now Canada is nice. In the United States this would be against the law.

Golitschek: Yeah, ah, it's not against the law in Canada?

Kiniry: In ah, well I'm not sure but in the States we don't dare do any ... [ellipsis in original]

At the conclusion of the October 30 videotaped conversation Golitschek was arrested and subsequently extradited to the United States.

### III.

The two-count indictment alleges conspiracy and wire fraud offenses, in violation of 18 U.S.C. §§ 371, 1343 (1982). Count 1 alleges a conspiracy to commit three "offenses." The first is making, using, and causing the making and using of false export documents for the purpose of exporting articles for which license approval is required by federal regulations, in violation of 22 U.S.C. § 2778(b)(2), (c) (1982). The second is making a false statement in a

matter within the jurisdiction of the Department of State, in violation of 18 U.S.C. § 1001 (1982). The third is to defraud the United States and the Department of State in two respects: "by impairing, obstructing and defeating the lawful functions of the Department of State in its implementation of the foreign policy of the United States" and "by obtaining and attempting to obtain export licenses for articles on the United States Munition [*sic*] List by presenting false and fraudulent documents."

### IV.

The Government's evidence consisted primarily of the audiotapes of the telephone conversations between Kiniry and Golitschek and the videotape of their meeting in Toronto. An official of the State Department's Office of Munitions Control explained the application procedures for an export license, particularly the function of Forms DSP–5 and DSP–83.

Golitschek testified in his own defense. He acknowledged that the helicopters he was discussing with Kiniry were destined for Iran. He maintained that he had never seen Forms DSP–5 or DSP–83, that he thought an end-user certificate was an import document obtained by the nominal buyer, that the document could validly list the importing country as the end user, that the document was needed to satisfy the Swiss bank arranging for the letter of credit, and that he was unaware of any restriction on an importer's right to transship to Iran. He acknowledged that he had some awareness of limitations on the ability of American firms to export arms to Iran, but he maintained that he understood they were able to do so by using foreign subsidiaries. He insisted that he had never contemplated furnishing false documents to the State Department, nor in any way agreed with his European associates to furnish such false documents.

Golitschek was convicted on both counts and sentenced to concurrent terms of three and one-half years, with credit for time spent in custody since his arrest in Canada on October 30, 1985.

### V.

On appeal Golitschek raises numerous issues, some of which are also advanced in an amicus brief filed by the Republic of Austria. Initially, he challenges subject matter jurisdiction, contending, among other things, that the export regulations he is accused of conspiring to violate are not intended to apply to a foreign national abroad, *see* 22 C.F.R. § 127.1(b) (1986), and that even if jurisdiction was intended by Congress to be exercised over a person in his circumstances, it may not validly be exercised consistent with the Due Process Clause and principles of international law. In a related argument he contends that if telephone calls from abroad to the United States can be the basis for assertion of United States jurisdiction, as contended by the Government, *see United States v. Gilboe*, 684 F.2d 235, 237–38 (2d Cir.1982), *cert. denied*, 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983), such jurisdiction is improper in this case because the calls were initiated by a Government agent and therefore involve improperly manufactured jurisdiction. *See United States v. Archer*, 486 F.2d 670, 681–82 (2d Cir.1973).

The Republic of Austria also challenges the assertion of United States jurisdiction, complaining vehemently about the Government's conduct in soliciting Golitschek in Austria, proposing an arms deal to him, and then luring him to Canada so that he could be arrested and extradited to the United States. Acknowledging that undercover sting operations have been upheld in the domestic context, *see United States v. Williams*, 705 F.2d 603 (2d Cir.) (Abscam), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983), Austria contends that "while under United States law it may be proper to obtain a conviction based on evidence of criminal predisposition shown to undercover government agents as part of a scheme totally concocted by the government agents, it is unreasonable for the United States to exercise extraterritorial jurisdiction over foreigners in their

homes abroad under similar circumstances." Brief for Amicus Curiae at 16.

Golitschek and Austria also challenge the conviction on the ground that the undercover agent deliberately avoided confronting Golitschek with a clear opportunity to indicate whether or not he was interested in violating United States law and obscured the nature of the documents that Golitschek would ultimately be charged with conspiring to falsify. *See United States v. Myers*, 692 F.2d 823, 843 (2d Cir.1982) ("Perhaps at some point deliberate governmental efforts to render ambiguous events over which agents can exercise considerable control would transgress due process limits of fundamental fairness."), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983).

Austria adds an additional argument arising out of international law considerations, contending that the prosecution violates Article VII of the Treaty of Friendship, Commerce and Consular Rights between the United States and Austria of June 19, 1928, and May 28, 1931, in that the regulations pertinent to arms export licensing were not publicized in Austria nor made clear to Golitschek in the course of the undercover operation.

Golitschek also contends that the indictment fails to allege an offense to the extent that it includes allegations that he conspired and schemed to deprive the State Department of its "right to implement the foreign policy of the United States." He contends that this objective of the conspiracy and scheme is too vague, raises political questions, and, in any event, cannot validly be charged against a foreign national acting in his own country.

Additional claims raised on appeal are that the evidence is insufficient to show an agreement between Golitschek and any person not an agent of the United States Government to commit the offenses charged in the indictment, that the evidence prejudicially varied from the indictment, and that the instructions on numerous topics were erroneous. We have decided to focus initially on the claim that the charge was erroneous on the issue of the requisite state of mind.

## VI.

Judge Elfvin instructed the jury that both offenses charged in the indictment required proof of specific intent. This, he explained, required proof beyond a reasonable doubt "that the Defendant knowingly did an act which the law forbids, purposely intending to or having a gross [dis]regard whether his acts would violate the law."[2] He also gave the following instruction, which is the focal point of appellant's claim of error:

It is not necessary for the prosecution to prove that the Defendant actually knew that a particular act or failure to act was a violation of law, unless and until outweighed by evidence in this case to the contrary the presumption is that every person knows what the law forbids and what the law required to be done. However, evidence that the Defendant acted or failed to act because of ignorance of the law rather than she[e]r disregard of the law is to be considered by you in determining whether the Defendant acted or failed to act as charged and with the specific intent.

Pertinent to appellant's challenge to this instruction, which he sought to eliminate during the charging conference, is a supplemental instruction given after defense counsel objected to the original jury

---

**2.** The use of this stock language, indeed, the use in instructions of the term "specific intent" have received richly deserved criticism. *See Liparota v. United States*, 471 U.S. 419, 433 n. 16, 105 S.Ct. 2084, 2092 n. 16, 85 L.Ed.2d 434 (1985); *United States v. Bailey*, 444 U.S. 394, 403–06, 100 S.Ct. 624, 631–33, 62 L.Ed.2d 575 (1980); *United States v. Arambasich*, 597 F.2d 609, 612–13 (7th Cir.1979); *see generally* W. LaFave & A. Scott, *Handbook on Criminal Law* § 28 at 201–02 (1972). As the Supreme Court has observed, "A more useful instruction might relate specifically to the mental state required under [the pertinent statute] and eschew use of difficult legal concepts like 'specific intent' and 'general intent.'" *Liparota v. United States, supra*, 471 U.S. at 433 n. 16, 105 S.Ct. at 2092 n. 16.

charge. Though Judge Elfvin had denied defense counsel's request to strike from the indictment the objects of the conspiracy and fraud scheme concerning impairment of the Government's foreign policy functions, he agreed, after hearing defense counsel's exceptions, to focus the jury's attention precisely on the alleged plan to transship helicopters to Iran and to submit false export documents. In the supplemental instruction the District Judge said:

> ... it is not sufficient under either count of the Indictment for the prosecution to pro[ ]ve that the Defendant agreed or schemed to circumvent the wishes of the United States Government by arranging for the sale of weapons to a buyer in Spain, and then the sale or transfer of those weapons to Iran. The Government must pro[ve] that the Defendant knew that or had a disregard whether such transfer was also prohibited by the regulations and law and knew that he would have to submit false documents or that false documents in reasonable expectation [would have to] be submitted in order to accomplish this, and that this was part of any agreement alleged in Count 1 or any plan or scheme or artifice alleged in Count 2.

Thus, the jury was told that Golitschek could not be convicted unless the Government proved that he knew that a transfer of the helicopters from Spain to Iran was prohibited by law, but was also told that every person is presumed to know what the law forbids.

■ This combination of an instruction that the charged offenses require some knowledge of the law and an instruction that everyone is presumed to know the law was erroneous. As the commentary to the Model Penal Code well states, "[T]he general principle that ignorance or mistake of law is no excuse is usually greatly overstated; it has no application when the circumstances made material by the definition of the offense include a legal element." *Model Penal Code* § 2.02 comment 11 at p. 131 (Tent.Draft No. 4, 1955). The Supreme Court recently applied these observations in reversing a conviction for unauthorized possession of food stamps. *Liparota v. United States,* 471 U.S. 419, 105 S.Ct. 2084, 62 L.Ed.2d 575 (1985). The Government had contended that it was sufficient for the jury to find that the defendant knew he possessed food stamps and that in fact his possession of the stamps was not authorized by law. The Court disagreed, carefully explaining the proper function of the adage that ignorance of the law is no excuse. It is a defense to the food stamp charge, the Court said, that the defendant did not know that his possession was unauthorized; it would not be a defense, however, that he did not know that possession in a manner unauthorized by law was illegal. *Id.* at 425 n. 9, 105 S.Ct. at 2088 n. 9.

■ To put the matter more generally, a defendant normally need not be shown to know that there is a law that penalizes the offense he is charged with committing. However, he must be proven to have whatever state of mind is required to establish that offense, and sometimes that state of mind includes knowledge of a legal requirement. The most familiar example of this principle occurs in prosecutions for tax offenses. The state of mind required for a conviction under those statutes proscribing "willful" tax misconduct includes knowledge of a legal duty to comply with statutory tax obligations. "[T]he word 'willfully' in these statutes generally connotes a voluntary, intentional violation of a *known* legal duty." *United States v. Bishop,* 412 U.S. 346, 360, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973) (emphasis added). Knowledge of this legal duty must be proved. However, it is not necessary for the prosecution to go further and prove that the defendant knew there was a law punishing willful non-payment of taxes. *See also Lambert v. California,* 355 U.S. 225, 228–29, 78 S.Ct. 240, 242–43, 2 L.Ed.2d 228 (1957) (conviction of offense of failing to register as a felon requires proof of knowledge of obligation to register).

■ When we say that ignorance of the law is no excuse, or, as was said in this

case, that everyone is presumed to know the law, we mean only the law that makes the offense punishable, not the law that in some circumstances sets out legal requirements that must be known in order to have committed the offense. The distinction is not the less vital because it is subtle. Moreover, when the law makes knowledge of some requirement an element of the offense, it is totally incorrect to say that ignorance of such law is no excuse or that everyone is presumed to know such law. Establishing an element of an offense concerning a requisite state of mind by a presumption relieves the prosecution of its burden of proof, contrary to the requirements of due process. *See Sandstrom v. Montana,* 442 U.S. 510, 524, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1979).

■ In this case the District Judge correctly recognized that the offenses charged required knowledge of a legal obligation. *See United States v. Davis,* 583 F.2d 190, 192–94 (5th Cir.1978). The Government does not dispute that it was obliged to prove that Golitschek knew, as Judge Elfvin instructed in the supplemental charge, that unauthorized transshipment of the helicopters from Spain to Iran was contrary to requirements of United States law and that false documents would have to be submitted to the State Department to obtain approval for the planned sale.[3] But it was error to tell the jury that the requisite knowledge could be found simply because everyone is presumed to know the law, placing on the defendant the burden of presenting evidence that outweighed this presumption. *See United States v. Davis, supra,* 583 F.2d at 193–94.

■ Indeed, it is arguable that this prosecution of an Austrian citizen for actions taken in his own country is that rare case where it would be incorrect even to presume that the defendant is aware of the law punishing the offenses for which he is charged. Whether or not that is so, there is no doubt that he, like a United States citizen charged with similar offenses occurring wholly in this country, may not be presumed to know the law that establishes the legal requirement that must be known in order to commit the offenses charged. Especially in light of the fact that the defendant is an Austrian whom the Government propositioned in his own country to commit arms export violations and in light of the equivocal nature of the evidence concerning what the defendant knew about export license documentation required by United States regulations, the error in the charge was highly prejudicial and requires reversal of the conviction.

■ Normally, we would proceed at this point to consider defendant's other challenges on appeal because many of them bear on whether there may be a retrial and, if so, how such a retrial is to be conducted. In particular, we would normally be obliged to consider the contention that the United States lacks jurisdiction to prosecute under the circumstances disclosed by the record. Three related considerations, however, impel us to defer resolution of the remaining issues of his appeal. First, the issues of jurisdiction and the other contentions that arise because the defendant is an Austrian citizen against whom the Government conducted a sting operation in his own country

---

**3.** We do not mean to imply that every offense concerning export of munitions necessarily requires knowledge of regulatory requirements. For example, if the defendant had completed a DSP–83 that falsely listed Spain as the end user of the helicopters and if he had been charged with the substantive offense of submitting a false statement in a matter within the jurisdiction of the State Department, in violation of 18 U.S.C. § 1001, the offense might arguably be established by proof that he knew the document was false without regard to whether he knew that such a document was required. *Cf. United States v. Yermian,* 468 U.S. 63, 104 S.Ct. 2936, 82

L.Ed.2d 53 (1984) (actual knowledge of federal agency jurisdiction not required for conviction under section 1001, where jury instructed that Government must prove the defendant knew "or should have known," *id.* at 75 n. 14, 104 S.Ct. at 2943 n. 14, that his statements were within agency jurisdiction). Golitschek, however, was charged with the inchoate offense of conspiracy and the substantive offense of using the telephone to advance a scheme that was at best in an incipient stage. In such circumstances, knowledge of the requirements concerning end-user documents was required to be proven.

are matters on which we would like to have the considered views of the Department of State. Second, the defendant has been in custody for more than thirteen months of a three and one-half year sentence. Third, it is not certain that the Government would wish to retry him even if it prevails on the remaining issues. Under these circumstances, we have concluded that the appropriate course is to issue at this time a partial judgment reversing the conviction and remanding the case to the District Court for the limited purpose of setting reasonable conditions of bail. Thereafter, if advised that the Government intends to retry the defendant, we will invite the views of the State Department on the issues that implicate foreign relations and, with the benefit of those views, proceed to determine the remaining issues of the appeal.

Conviction reversed; judgment in accordance with opinion; mandate to issue forthwith.