UNITED STATES of America, Appellee,

v.

Herbert Alwyn SMITH, and Joseph Shea Peeples, Defendants–Appellants.

Nos. 1387, 1388, Dockets 90–1090, 90–1091.

United States Court of Appeals, Second Circuit.

Argued June 6, 1990.

Decided Oct. 31, 1990.

Michael H. Sporn, New York City, for defendant-appellant Smith.

Martin G. Fogelson, New York City, for defendant-appellant Peeples.

James B. Comey, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D. New York, Joan McPhee, Asst. U.S. Atty., of counsel), for appellee.

Before KEARSE, WINTER and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Appellants Herbert Smith and Joseph Peeples appeal from their January 30, 1990 convictions on one count of conspiracy to violate the Arms Export Control Act 22 U.S.C. § 2751 *et seq.* and to commit wire fraud, and thirteen counts of wire fraud after an eight day jury trial presided over by Judge Keenan. They appeal on several grounds: 1) that the indictment used to originally charge them, which became defective under *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), could not be cured by mere redaction of non-*McNally* material, but required a new presentation to a grand jury; 2) that the evidence was insufficient to convict; 3) that the district court's jury instruction on the knowledge requirement for violation of the Arms Export Control Act was improper; 4) that the district court wrongly prevented an informant from testifying; 5) that the court erred in denying a severance; and 6) that the court's denial of defendants' Speedy Trial motion was error.

Because we find each of these contentions to be without merit, we affirm.

## BACKGROUND

In late 1980 Angelo Spateri began to look for buyers for seven Agusta Bell AB 204 B helicopters. Defendant Smith contacted Spateri and offered to buy them for $5 million. Spateri told him that in order to complete the sale Smith would need to provide an end-use certificate (E.U.C.) which would state the destination and intended use of the helicopters. Smith originally told Spateri he was purchasing the helicopters for the Thailand Air Force, and Spateri received a confirming telex purportedly from that organization. However, upon checking the transmittal number in a directory, Spateri noted that the telex had been

sent from a textile company in Thailand. Smith then produced another "buyer"—the Ajman Bosco Refinery Company Ltd., located in Ajman, one of the United Arab Emirates—which Smith said needed the helicopters for its normal working operations. Smith provided a letter on Bosco letterhead to that effect which, together with two documents in Arabic, constituted his total E.U.C. documentation, although he said that he could provide a representation from the Government of Ajman if necessary. Smith closed the deal by giving Spateri a postdated check for $5 million.

Spateri then wrote to the Office of Munitions Control (OMC) in the Department of State (State) inquiring whether a State license would be necessary to export the helicopters. State wrote back that because the helicopters could potentially be armed, they fell within Category VIII of the United States Munitions List and required a license for export. Spateri told Smith about this letter. On February 10, 1981, Spateri applied to the OMC for an export license, enclosing the material Smith had given him for an E.U.C. On March 30, 1981, State returned Spateri's application, but added that it could be resubmitted upon written confirmation of interest by the Ajman government. Spateri tried to inform Smith of this, but could not reach Smith until a week later, when Smith called Spateri and informed him that he already knew of the rejection, and that obtaining the necessary confirmation would be "no problem." Spateri never heard from Smith again.

In the meantime, Smith had been busy on another front. Starting in February 1981 he had been trying to sell these same helicopters to Joseph King, a Customs Service Special Agent posing as a broker seeking to buy helicopters for Iran. King first became interested in Smith when a supplier of Cobra gunship attack helicopters told him that some AB 204 B helicopters were available and referred him to defendant Peeples, as one who could get him in touch with the owner of the helicopters.

Peeples, acting as Smith's representative, told King when King first contacted him on March 5 and 6, 1981 that the helicopters had "gun mounts on them", and had export papers which were "bulletproof", including an E.U.C. ostensibly for delivery to a "friendly Arab country". He represented that the helicopters were owned by a Middle East oil company and could "immediately be armed." Peeples then put King in contact with Smith.

On March 9, 1981 Smith told King that he had an export license and "in theory" the helicopters were "supposed to go to Ajman", but that he had approval from the Arabs for transshipment. The next day he told King that the refinery end use for the helicopters was merely "camouflage", and that "if you can't beat them legally, you beat them another way, don't you?" He then asked for $6.25 million—twenty five percent of the purchase price—up front to pay for "shipping costs." King expressed doubts about the availability of the helicopters, saying that he had heard that there was a Customs Service lien on the helicopters due to irregularities in their shipment to the United States. Smith denied that there was such a lien, and told King to have his clients deposit their payment into a bank account to be released as soon as the helicopters were loaded onto a ship. Smith also told King again that the helicopters had an export license from the State Department, reading from State's letter to Spateri returning his application, but changing the ending to read "Currently no restrictions for Ajman apply."

Later in the day Smith admitted that there was a Customs lien, but promised to pay it. He also said that an export license would be available the next day. He told King to tell his client, Iran, that the helicopters were "the difference between them winning and losing a war." On March 13 Smith altered his story: the Customs lien would be paid once he had proof that King's client would buy the helicopters, and the export license would issue when the lien was paid. Smith added that he and Peeples wanted King's client to put up a bank guarantee releasing payment when the export license came through.

In the beginning of April, Smith and Peeples moved to close the deal. Smith told King on April 7 that the lien had been lifted, on April 8 that "we have our license now", and on April 9 telexed him requesting an irrevocable purchase order that same day. Peeples also called King on April 9 to report that Smith had received the export license. King telexed Smith confirming his agreement to buy the seven helicopters, subject to Smith getting an export license and a verifiable E.U.C. On April 13 Smith purported to accept King's offer, telexing "The export license has been issued. The verifiable E.U.C. has been accepted." But he refused to ship the helicopters until King paid him, which he insisted on being done outside of the United States. On April 14, 1981, King telexed Smith in response that he had heard that State had returned Spateri's application for an export license without action. Smith did not respond.

Peeples continued to push the sale, purporting to be speaking for Smith. In an April 16 telex Peeples offered to travel to New York to meet with King. The next day Peeples telexed that Smith had a provisional export license, and that he and Smith would personally see the head of the OMC to clear up any misunderstandings. On April 22 Peeples told King to call him in Switzerland. When King called, Peeples told him that Smith was planning to straighten things out with the OMC in the next few weeks, but would do so immediately if King provided him with a bank guarantee. When King offered to put the funds in escrow with his own attorney, Peeples said such an arrangement had to include "some penalty ... in favor" of Smith. By the next day, however, Peeples told King that Smith said "escrow will not do", and that Smith was getting a bank guarantee from another buyer, Libya. Peeples urged King to provide a bank guarantee first, and then Smith would transfer his ownership documents to King. On April 24 Peeples sent a final telex to King, urging him to supply a bank guarantee or a letter of credit to secure the sale.

On May 7, 1981 King telexed Smith, asking that he or Peeples call. On July 28,

King sent another telex requesting contact. Smith responded to this, saying that he would not take an escrow and demanding a bank guarantee equal to half the total purchase price. That was the last King heard from Smith. In 1982 King contacted Peeples in Europe in an attempt to locate both defendants in order to arrest them. In 1985 Smith and Peeples were indicted, and in 1986 they were arrested.

Count one of the indictment as originally filed charged Smith and Peeples with participating in a conspiracy with three alleged objectives: (1) to make false statements to the OMC in connection with an export license application, in violation of 22 U.S.C. § 2778(c); (2) to export the helicopters without a valid license issued by the OMC, in violation of 22 U.S.C. § 2778(b)(2); and (3) to commit wire fraud, in violation of 18 U.S.C. § 1343. The scheme underlying the wire fraud objective of the conspiracy, as well as the thirteen substantive wire fraud counts, had two components: 1) obtaining money from prospective purchasers of the helicopters by falsely representing that an export license had been issued for them and 2) defrauding the United States of its right to control the export of defense articles and munitions.

*Proceedings*

In the first prosecution, Peeples pled guilty to the above counts. Smith went to trial, and Peeples testified for the government in its rebuttal case. On August 25, 1986 the jury returned a verdict of guilty against Smith on all fourteen counts. This Court affirmed Smith's conviction by summary order. Smith then moved for a rehearing, in the aftermath of the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which held that mail fraud does not include the fraudulent deprivation of intangible, non-property rights, and our decision in *United States v. Evans*, 844 F.2d 36 (2d Cir.1988), which applied this principle to the government's right to control arms exports charged in the second component of the wire fraud scheme. Since a general verdict had been returned

against Smith, it was not possible to determine that the verdict did not rest in part on the scheme component proscribed by *McNally*. We remanded the case for retrial on those portions of the indictment still valid after *McNally*. Before trial Smith moved to dismiss the indictment arguing, as he does here, that the government should be forced to represent the case to a grand jury. The district court denied the motion, and Smith was retried along with Peeples, who had withdrawn his guilty plea, on an indictment from which all mention of a conspiracy to deprive the government of its intangible right to control arms exports had been redacted. At the second trial, Smith and Peeples were convicted on all counts, and this appeal followed.

## DISCUSSION

### A. *Redacted Indictment*

■ Smith and Peeples' principal argument in this appeal is that the district court's failure to order the government to re-present an indictment properly purged of intangible non-property rights fraud charges to a grand jury deprived them of their fifth amendment right to a grand jury. We disagree.

■ It is well settled that a defendant has a fifth amendment right to be tried only on charges presented in an indictment returned by a grand jury. *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). However, narrowing the scope of an indictment, whether through proof of a lesser offense offered at trial, or by redaction, does not offend the notice and review functions served by a grand jury's issuance of an indictment. "As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985). Those sections which will not be part of the proof at trial are treated as "useless averment" that can be "ignored", or simply redacted. *Id.*

Of course narrowing the scope an indictment does not always guarantee its integrity, because the allegations therein can be intertwined in such a way that removing one or two may destroy the coherence of the offense charged. However, when charges stand independently of one another, removing one does not affect the integrity of the indictment charging the others. More specifically, when an indictment charges a fraud scheme with several objectives, if each objective constitutes a fraud separate from the others the removal of one does not disturb the indictment's validity in charging the other frauds. *See United States v. Eckhardt*, 843 F.2d 989, 996–98 (7th Cir.1988), *cert. denied*, 488 U.S. 839, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988), *O'Leary v. United States*, 856 F.2d 1142, 1143 (8th Cir.1988).

Applying these principles to the case before us, we note that the redacted indictment differed from the one used at defendants' first trial only in the exclusion of all language relating to a wire fraud scheme to obtain an export license from State by fraud. The words "by fraudulently obtaining an export license from the Department of State" were redacted from the wire fraud objective of the conspiracy count set forth in paragraph 11. The wire fraud scheme alleged in paragraphs 14 through 18 was similarly reduced by redacting paragraph 16 and part of paragraph 17. Paragraph 16 charged defendants with a scheme to defraud the government "of [its] governmental interest and function of basing licensing decisions on true and accurate information", and the redacted part of paragraph 17 accused defendants of "fraudulently obtaining an export license from the Department of State". While these allegations, charging a fraudulent scheme to deprive the government of an intangible non-property interest, could not survive *McNally*, their removal simply narrowed the scope of the indictment and had no effect on its continuing validity.

This is not a situation where the two frauds charged were not easily separable. Smith and Peeples were originally charged with 1) defrauding the government of its

right to proper information as to arms exports and 2) defrauding King of money by misrepresenting the existence of a valid export license. In effect the defendants were attempting to defraud both the government and King. The two frauds were independent and, indeed, appear to have been mutually exclusive: the success of the first fraud—to obtain a valid license through misrepresentation—would have obviated the need for the second—to defraud King of money by misrepresenting to him that it had been issued. Accordingly the district court did not err in proceeding to trial under the redacted indictment.

### B. *Sufficiency of the Evidence*

Smith and Peeples next claim that there was insufficient evidence of a scheme to defraud King to sustain the jury verdict on the wire fraud counts and to support that objective of the conspiracy. They also claim there was insufficient evidence of a plan to violate the Arms Export Control Act by making false statements to the government and by exporting without a valid license to sustain convictions for those objectives of the conspiracy. Because "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it," *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *see United States v. Koskerides,* 877 F.2d 1129, 1137 (2d Cir. 1989), defendants face a heavy burden in establishing this claim.

The record is replete with evidence that Smith and Peeples fraudulently intended to separate Agent King from his money without giving him what he bargained for—seven helicopters capable of being validly exported to the Middle East. On March 9, 1981 Smith falsely told King that he already had an export license. On March 10 Smith said that his Swiss bank account should act as the escrow account, and asked King for twenty five percent of the purchase price up front. By April 14, 1981, after Smith and Peeples knew from King and Spateri that the license had been denied and that, since it was based on false information, it never would be approved,

they continued to attempt to extract payment from King. On April 22 Peeples told King to provide a bank guarantee while they worked things out personally with the OMC. On April 23 Peeples told King that an escrow account would no longer suffice, and that a bank guarantee was necessary before Smith would transfer ownership documents. On July 30 Smith demanded a bank guarantee equal to half of the purchase price. From the foregoing, a jury could reasonably conclude that Smith and Peeples, fully realizing that they did not have a license and would not get one, attempted to extract money from King by misrepresenting that they could supply him with helicopters that could legally be shipped to the Middle East.

The jury heard sufficient evidence on the Arms Export Control Act conspiracy charges as well. Smith told King that the Bosco oil refinery was a ruse to allow the helicopters to reach the Middle East, where they could then be diverted to another country for military use. Smith was never able to supply the written confirmation of interest from the Government of Ajman requested by State. Peeples acted to further this object of the conspiracy by telling King that the helicopters could be armed and shipped anywhere in the world. On the whole, the evidence as to both defendants was sufficient for the jury to find them both guilty of conspiracy to make false statements to the OMC and to transport military items without a valid license.

### C. *The District Court's Instructions on the Knowledge Required for a Violation of the Arms Export Control Act*

Defendants claim that the district court's instruction on the level of knowledge required before a defendant can be convicted of a conspiracy to violate the Arms Export Control Act was inadequate. Judge Keenan charged:

You must determine whether the government has proven beyond a reasonable doubt that a defendant unlawfully, wilfully, and knowingly agreed and specifically intended to export Agusta/Bell 204 B helicopters from the United States

in a manner inconsistent with the licensing requirements of the Arms Export Control Act; and that the defendants had knowledge that the Agusta/Bell 204 B helicopter was subject to the licensing requirements of the act.

\* \* \* \* \* \*

Whether the defendant whom [you are] considering knew about the licensing requirements and that the Agusta/Bell 204 B helicopters were subject to the licensing requirements are questions you must answer based on all of the evidence in the case.

These instructions were sufficient. The jury was told that defendant must have known that the helicopters to be exported were subject to the licensing requirements of the Arms Export Control Act and that he intended to export them in a manner inconsistent therewith. *United States v. Durrani*, 835 F.2d 410, 423 (2d Cir.1987). Defendants' reliance on *United States v. Golitschek*, 808 F.2d 195 (2d Cir.1986) is misplaced. In *Golitschek*, we reversed after the district judge charged "that [the defendant] could not be convicted unless the Government proved that he knew that a transfer of the helicopters from Spain to Iran was prohibited by law," but also told the jury that, in effect, "every person is presumed to know what the law forbids." *Id.* at 202. The deficiency in *Golitschek*, not present here, was that the presumption language effectively nullified the knowledge instruction.

Moreover, neither defendant objected to Judge Keenan's instructions on the requisite degree of knowledge. Thus they have waived their claim unless the claimed error went to the "very essence of the case," *United States v. Calfon*, 607 F.2d 29, 31 (2d Cir.1979), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980), and was "so 'plain' [that] the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). In this case, Judge Keenan's charge was not only not plain error, it was appropriate.

## D.  *Remaining Points*

■ Smith argues he should have received a severance when the government introduced into evidence Peeples' testimony from the first trial. Although references to Smith had been replaced by neutral pronouns, he argues that the context of the references still implicated him. This argument is foreclosed by *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), as followed in this circuit by *United States v. Tutino*, 883 F.2d 1125, 1134–35 (2d Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990), and *United States v. Alvarado*, 882 F.2d 645, 651–53 (2d Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990), which reject this contextual approach. As the statements are not "facially incriminating" as to Smith and were accompanied by an appropriate limiting instruction, there was no error. *See United States v. Alvarado*, 882 F.2d at 652–53.

■ The district court acted within its discretion in excluding as irrelevant the testimony of the informant Gibson. Gibson had introduced Agent King in 1981 to Cunningham for the purpose of King's buying Cobra helicopters. When Cunningham was unable to produce the Cobra helicopters, he referred King to Peeples in order to arrange a different transaction involving the AB 204B helicopters that Spateri was arranging to sell to Smith. Before trial, the government arranged for defense counsel to speak on the phone to Gibson in London. Gibson could not recall his introduction of King to Cunningham nine years earlier and stated that he had never met Smith or Peeples. Under the circumstances, where defense counsel was unable to demonstrate any connection between Gibson and the material facts at issue in the case, and where Gibson plausibly stated that he could not even recall the immaterial ones, the district court did not abuse its discretion in excluding his testimony as irrelevant.

Finally, Smith argues that the Speedy Trial Act was violated when the second trial was held 113 non-excluded days after

remand to the district court. However, Smith has simply overlooked certain appropriate time exclusions made by different judges in the interest of justice before it was assigned to Judge Keenan. Thus the second trial was in fact held after the expiration of 51 non-excludable days, well within the 70 day limit of the Speedy Trial Act.

The judgment on all counts is affirmed.