**UNITED STATES of America, Appellee,**

v.

**Rajindar K. MANIKTALA, Defendant–Appellant.**

**No. 1505, Docket 90–1557.**

United States Court of Appeals, Second Circuit.

Argued April 16, 1991.

Decided May 21, 1991.

Mark F. Pomerantz, Rogers & Wells, New York City (Thomas J. Lilly and George J. Szary, of counsel) for defendant-appellant.

Edward R. Broton, Asst. U.S. Atty., Syracuse, N.Y. (Frederick J. Scullin, Jr., U.S. Atty., for N.D. N.Y.) for appellee.

Before LUMBARD, FEINBERG and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Defendant Rajindar Maniktala appeals from a judgment entered in the United

States District Court for the Northern District of New York (Howard G. Munson, *Judge*) following a jury verdict convicting him on fifteen counts of mail fraud. 18 U.S.C. § 1341. The district court granted a post-trial motion for a judgment of acquittal, but only as to one count of the indictment. Fed.R.Crim.P. 29(c). On August 7, 1990 the court imposed concurrent sentences on the remaining fourteen counts of five months incarceration, to be followed by a two-year term of supervised release, the first five months of which is to be served in a half-way house or community treatment center. Defendant was also fined $32,942.

Maniktala was president of Maniktala Associates ("MA"), an engineering firm engaged in consulting work with its principal place of business in Liverpool, New York. In 1986 defendant's firm acquired a controlling interest in another engineering consulting firm, William Harrington Associates ("WHA"), a Maryland-based operation. In July 1987, the County of Onondaga, New York, awarded a contract to WHA, the Maryland operation, to perform engineering work for a landfill site located in New York. Because of the corporate relationship between MA and WHA, all billing and bookkeeping were processed through defendant's office in Liverpool, New York.

In August 1989, a federal grand jury handed up an indictment charging Maniktala with fifteen counts of mail fraud. The thrust of the government's case is that defendant overbilled Onondaga County by more than $33,000 by altering the time sheets signed by WHA workers to add approximately 690 bogus hours.

In proof of its case, the government presented three sets of time sheets that ideally should have been identical, but were not. The first set contained the original time sheets filled out in pencil by the WHA workers (curiously, the requirement that this set be filled out in pencil seems to have been imposed by MA after it took control of WHA). These "pencil originals," although filled out in Maryland where the workers were located, were shipped to the defendant's office in Liverpool, New York.

They were admitted into evidence at trial as the "200 series" of exhibits, i.e., as exhibits 201, 202, etc.

Before the "pencil originals" were shipped to Liverpool, the workers made photocopies that were kept in Maryland, and these copies were admitted as the "100 series." The final set of time sheets, marked as the "300 series," was the set actually included with the bills that MA sent to Onondaga County as proof of the time expended on the project. The evidence showed that the times recorded on the 300 series jibed with those appearing on the pencil originals (the "200 series"), but did not square with the Maryland photocopies of the pencil originals (the "100 series"). Obviously, someone had tampered with the "200 series."

Nine workers at WHA testified that the Maryland photocopies (the "100 series") were accurate and that the changes made in the pencil originals (the "200 series") and then appearing in final form in the bills submitted to Onondaga County (the "300 series") were neither made nor authorized by them. The government's case consisted primarily of tracking the paper trail through the various series, and, by process of elimination, seeking to prove that it was the defendant who made the corrupt changes in Liverpool.

Before trial, defense counsel made a written request for discovery, stating that his "initial interest is in the time sheets." The government provided copies of the 100, 200 and 300 series of time sheets that it planned to use at trial. During the trial testimony of Lynn Lyons, an accounting clerk at MA, it became evident that yet a fourth series of time sheets was kept, that it had been turned over to the government, but was never passed along to the defense.

The fourth series was created when suspicion began to fester among company workers in both Maryland and Liverpool that defendant might be doctoring time sheets. This hunch prompted Victor Basile, the MA company comptroller in Liverpool, to instruct Lyons that she should start making copies of the time sheets before, as well as after, they were presented

to the defendant for approval. Lyons testified that she did so, and turned the extra copies over to Victor Basile. When questioned at trial on the whereabouts of the extra copies, Basile testified that he had surrendered them to the government.

At this critical juncture in the trial, defense counsel stated to the court that he had never seen the fourth series and requested its production. The prosecutor, in the belief that he had already produced all documents in the government's possession and that defendant, thus, already had copies of the fourth series, stated on the record: "I have no objection to that. I don't have them right here, they are in my office. If he needs them right now I will have to go get them but if he can continue, I can give them to him during the lunch break."

During the luncheon recess, the prosecutor advised defense counsel that the government did not possess any fourth series of time sheets and, moreover, that he believed everything Basile had provided to the government had already been produced in pre-trial discovery. Defense counsel did not bring this new development to the court's attention, did not seek a continuance and did not attempt to pursue discovery of the fourth series before the jury verdict. In March 1990, after Maniktala's conviction, but while post-trial motions were still pending, the government finally discovered the fourth series during an office move. Relying principally on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), defense counsel seized upon the belated production to move for a new trial.

A page-by-page comparison of the time sheets in the fourth series with the forty-seven government time sheets admitted into evidence established that one sheet was *not* altered by the defendant. The government conceded that Lynn Lyons added one billable hour to the Onondaga project on that one time sheet.

The district court refused to grant a new trial premised upon the government's alleged discovery abuse, explicitly refraining from making a determination as to the materiality of the fourth series under *Brady.* In the court's view "defendant cannot prevail because, in brief, he did not pursue the matter to the point of non-disclosure and because he seeks redress for a failed trial tactic." Defendant, according to the court, deliberately elected not to pursue discovery of the fourth series, choosing instead to argue to the jury that the missing Basile fourth series raised a reasonable doubt. In a motion for reconsideration, defense counsel protested that, based upon his luncheon recess conversation with the prosecutor, he believed—and had every right to believe—that the government did not possess the Basile copies of the fourth series. The district court's response was pointed and unequivocal: "With all due deference to defense counsel for whom the court has the utmost respect, the court finds that the present position taken by defense counsel is untenable."

On appeal, defendant argues: (1) that the government's failure to produce documents in violation of its statutory obligation warrants a new trial; and (2) that the district court's charge on *mens rea* and specific intent amounts to plain error. For the reasons set forth, we affirm.

## DISCUSSION

### I. *Production of Documents*

■ In pressing his post-trial discovery claims before the district court, defendant focused on a *Brady* violation. We note at the outset that defendant has made a calculated shift of theories for purposes of this appeal. Maniktala now grounds his claim for a new trial on the government's breach of Federal Rule of Criminal Procedure 16(a)(1)(C). Defendant therefore has abandoned any *Brady* claim on appeal. Fed.R. App.P. 28(a); *see Stein v. Board of New York,* 792 F.2d 13, 18 (2d Cir.1986) (issue waived when rejected by district court but not raised on appeal), *cert. denied,* 479 U.S. 984, 107 S.Ct. 572, 93 L.Ed.2d 576 (1986); *see also Maynard v. Havenstrite,* 727 F.2d 439, 440 (5th Cir.1984) (appellant did not argue "other issues that were before the district court and they are deemed abandoned"). By pursuing this tactic, defen-

dant creates another obstacle to this appeal: because he did not make the Rule 16 argument before the district court he has, at least arguably, failed to preserve this claim for our review except for plain error. Fed.R.Crim.P. 52(b).

Recognizing that *Brady,* though not a discovery rule, affects discovery through its interplay with Rule 16, we will consider the merits of defendant's Rule 16 appeal. *See United States v. Starusko,* 729 F.2d 256, 262 (3rd Cir.1984) ("Unlike Rule 16 and the Jenks Act, however, *Brady* 'is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation' " and is not violated unless the government's non-disclosure infringes upon a defendant's right to a fair trial.) (quoting *United States v. Beasley,* 576 F.2d 626, 630 (5th Cir.1978), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979)); *see also United States v. Thevis,* 84 F.R.D. 47, 50 (N.D.Ga.1979) ("Not only the scope of disclosure, but the timing of the allowed discovery turns on the interplay of *Brady's* constitutional command upon the statutory mandates of Rule 16 and the Jenks Act.").

Rule 16 provides:

Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

Fed.R.Crim.P. 16(a)(1)(C). Consequently, "matters sought must be provided if any of three circumstances exist: they are material to the preparation of his defense; or are intended for use by the government as evidence in chief at trial; or were obtained from or belong to the defendant." 2 C. Wright, Federal Practice and Procedure § 254, at 66 (2d ed. 1982).

It is undisputed that the government did not use or, for that matter, ever intend to use the fourth series of time sheets as evidence in chief at the trial. In a single passing footnote, defendant claims that the Basile fourth series—which he styles as copies of MA time sheets (more accurately, they are copies of WHA time sheets) made on an MA photocopying machine by an MA employee—belongs to him as "an owner" of MA. To the extent any Rule 16 property interest in the Basile copies exists, we find it belongs to the corporation rather than defendant.

To prevail, therefore, Maniktala must demonstrate that the Basile copies are material to the preparation of his defense. *United States v. Buckley,* 586 F.2d 498, 506 (5th Cir.1978) (under Rule 16(a)(1)(C), "it is incumbent upon a defendant to make a *prima facie* showing of 'materiality' "), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1979). Materiality, of course, must be assessed against the backdrop of all the evidence presented to the jury. It has been said that:

Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.

*United States v. Ross,* 511 F.2d 757, 762–63 (5th Cir.) (citations omitted), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975); *see United States v. Reeves,* 892 F.2d 1223, 1226 (5th Cir.1990).

It is far from clear that the Basile copies are, as defense counsel would have us simply assume, material. The impeachment value of the Basile copies is considerably less significant than appears at first glance. Lynn Lyons testified that she never made any changes to the time sheets either before or after she presented them to Maniktala. All parties now concede that one hour out of a total of 690 billed to the Onondaga project was, in fact, the result of a time sheet change by Lyons. That one hour change, unlike the bulk of fraudulent changes, however, did not involve switching nonbillable hours to hours billed to the

Onondaga account; rather, the change consisted merely of adding one hour as an accounting entry to balance a time sheet with the other numbers legitimately reported on that time sheet. Through a sworn post-trial proffer submitted to the district court, the government reports that by her previous denial, Lyons has stated that she meant she had never changed nonbillable hours to report them as billable.

Defendant also asserts that the Basile copies are material because they are exculpatory. In Maniktala's eyes, the change now admitted to by Lyons casts a long shadow of reasonable doubt as to whether Maniktala made any of the other 689 fraudulent changes. It is clear, however, that except for the single change attributable to Lyons, the Basile copies serve to confirm that defendant was responsible for the hours fraudulently billed. The Basile copies overwhelmingly mirror the government's other proof provided in discovery and are, on balance, clearly inculpatory.

Maniktala finally argues that the Basile copies are material to his defense because they date from July 1987. According to Victor Basile's testimony, he had not requested Lyons to start making "before" and "after" copies until sometime in December 1987 or January 1988. Defendant laments his inability to cross examine on this perceived ambiguity, but we still fail to see how "the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *Ross*, 511 F.2d at 762.

Even if the Basile copies were material, Maniktala would not automatically win a new trial.

> Whether sanctions for nondisclosure of material evidence should be imposed involves a case-by-case assessment of the nature of the evidence sought, its bearing upon critical issues in the case, the reason for its nonproduction and the strength of the government's untainted proof. Where the government's failure to disclose is merely inadvertent or negligent, a new trial is required only if "there is a 'significant chance that [the] added item ... could have induced a reasonable doubt in the minds of enough jurors to avoid conviction.' "

*United States v. Petito*, 671 F.2d 68, 74 (2d Cir.) (citations omitted), *cert. denied*, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982); *see United States v. Grammatikos*, 633 F.2d 1013, 1019 (2d Cir.1980). On this record, the facts simply do not warrant a new trial because it cannot be said that the Basile copies would have made a difference.

## II. *Jury Instructions*

■ The parties do not contest that the district court gave proper instructions on specific intent when charging the jury on that issue in the mail fraud counts. Defendant maintains, however, that the following language in the court's general charge to the jury, coupled with a later instruction on specific intent, constitutes reversible error:

> It is not necessary for the prosecution to prove that the Defendant knew that a particular act or failure to act is a violation of the law, unless and until outweighed by the evidence in the case to the contrary[. T]he presumption is that every person knows what the law forbids and what the law requires to be done.

This language fatally echoes a similar instruction rejected by this circuit in the context of a specific intent crime, causing us to conclude that the "combination of an instruction that the charged offenses require some knowledge of the law and an instruction that everyone is presumed to know the law was erroneous." *United States v. Golitschek*, 808 F.2d 195, 201 (2d Cir.1986); *see United States v. Smith*, 918 F.2d 1032, 1038 (2d Cir.1990) ("The deficiency in *Golitschek* ... was that the presumption language effectively nullified the knowledge instruction."), *cert. denied*, —— U.S. ——, 111 S.Ct. 1086, 112 L.Ed.2d 1191 (1991).

It should be noted that, unlike the defendant in *Golitschek*, Maniktala did not object to this portion of the jury charge. Under well-established principles, therefore, defendant waived his objection "unless the claimed error went to the 'very essence of the case,' and was 'so plain [that] the trial judge and prosecutor were

derelict in countenancing it, even absent the defendant's timely assistance in detecting it.'" *Smith*, 918 F.2d at 1038 (citations omitted); *see United States v. Alkins*, 925 F.2d 541, 553 (2d Cir.1991); *United States v. Tillem*, 906 F.2d 814, 825 (2d Cir.1990) ("The plain error doctrine is used sparingly when necessary to redress a miscarriage of justice."). We do not deem the erroneous portion of the district court's charge to be plain error, especially where, as here, the nub of the case is who made the fraudulent changes, not the intent behind the changes.

## CONCLUSION

Accordingly, the judgment of the district court is affirmed.