UNITED STATES of America,

v.

Michael REDDY, John Fasciana, and Joseph Amato, Defendants.

No. S3 01 Cr. 00058(LTS).

United States District Court,
S.D. New York.

Jan. 7, 2002.

United States Attorney for the Southern District of New York, By Peter G. Neiman, Justin S. Weddle, New York City, for the United States.

Kostelanetz & Fink, LLP, By Robert S. Fink, New York City, for Defendant Michael Reddy.

Newman & Greenberg, By Richard A. Greenberg, New York City, for Defendant John Fasciana.

## OPINION AND ORDER

SWAIN, District Judge.

Defendants Michael Reddy ("Reddy") and John Fasciana ("Fasciana") seek an order (i) compelling the United States of America (the "Government") to supplement the indictment in this case (the "Indictment")[1] with a bill of particulars; (ii) directing the Government to identify immediately all documents that it intends to rely on in its case-in-chief; (iii) directing the Government to supplement its Rule 16 discovery, as well as its disclosures pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (iv) directing the early production of all materials subject to disclosure under *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and/or 18 U.S.C. § 3500; and (v) requiring early notice of the Government's intent to offer evidence of prior bad acts under Federal Rule of Evidence 404(b). Defendant Joseph Amato ("Amato") joins in the motion. For the reasons set forth below, Defendants' motion is denied.

## BACKGROUND

The Indictment charges Defendants with thirteen counts of mail and wire fraud in connection with an alleged scheme to defraud Electronic Data Systems, Inc. ("EDS"). The relevant facts alleged in the 31-page Indictment can be summarized as follows.

### EDS' Acquisition of FCI

Pursuant to a stock purchase agreement executed on or about May 4, 1995 (the "Purchase Agreement"), EDS purchased FACS Corporation International ("FCI"). Reddy had owned approximately 70% of FCI's stock and also served as FCI's chairman and CEO. Amato was the CFO of FCI, and owned approximately 1.6% of FCI's stock. After the purchase, FCI became part of EDS's Global Financial Markets Group ("GFMG"). Reddy became the chairman and CEO of the GFMG, and at various times in 1995 and 1996, Amato served as the GFMG's CFO. Fasciana served as counsel to FCI and its shareholders in connection with FCI's purchase by EDS. Indictment ¶¶ 1–4, 7.

In connection with the purchase, EDS paid approximately $6 million to the FCI shareholders, and agreed to make several contingent payments to the FCI share-

[1]. On January 23, 2001, the Government indicted Defendant John Fasciana. The Government subsequently filed a superseding indictment on March 22, 2001, indicting Michael Reddy as well, and filed a second superseding indictment on July 12, 2001, indicting Joseph Amato as well. Defendants' instant motion was filed on August 27, 2001. On December 4, 2001, the Government filed a third superseding indictment. The third superseding indictment makes no changes that affect materially the instant motion. All references in this Opinion and Order to the Indictment are to the third superseding indictment.

holders and to certain "key employees" who were to be employed by EDS after it purchased FCI. EDS paid $2 million into an escrow account controlled by Fasciana, and agreed that these funds would be released to the FCI shareholders if the GFMG met specified earnings targets for the eight months following the acquisition. EDS paid a further $1 million into the Fasciana escrow account pursuant to an agreement that those funds would be released to the FCI shareholders in May 1996 if the GFMG (i) met the year-end 1995 performance goals, and (ii) succeeded in collecting approximately $2.8 million in receivables that were outstanding on FCI's books at the time of the stock purchase ("Pre–Acquisition Receivables"). The Purchase Agreement further provided that the escrow funds relating to the Pre–Acquisition Receivables could be released on a dollar for dollar basis after May 1996 in connection with collections of those receivables. *Id.* ¶ 9. EDS also agreed, as part of an Incentive Compensation Plan ("ICP") with Reddy and other "key employees," to pay those individuals up to a total of $14 million in 1996, 1997, and 1998 if those key employees remained with EDS and if the GFMG met certain performance targets. *Id.* ¶¶ 9–10. Reddy agreed to pay Fasciana a portion of the contingent payments he received. *Id.* ¶ 11.

### The Business of the Asset Research and Recovery Division

GFMG, through its Asset Research and Recovery division, assisted bank and brokerage firm clients of EDS in recovering funds that had been erroneously escheated to states as abandoned property. The Asset Research and Recovery division analyzed records to identify any funds belonging to such a client that had been escheated in error to a state. Upon identification of such funds, the Asset Research and Recovery division prepared claims documenting the client's ownership of the escheated funds and caused those claims ("Escheatment Claims") to be presented to the state for payment. *Id.* ¶ 6.

The Asset Research and Recovery division also analyzed clients' records relating to funds that such clients had earmarked for escheatment in the future, but which had not yet turned over to state authorities because the requisite number of years had not yet passed ("Pre-escheatment Funds"). When it determined that located Pre-escheatment Funds belonged to a client (rather than a third party), the Asset Research and Recovery division assembled documentation demonstrating the client's ownership of the funds and presented the documentation to the client. If the client agreed that the Asset Research and Recovery division had established the client's ownership of the Pre-escheatment Funds, it would keep the funds rather than escheating them to the state. *Id.*

Another aspect of the Asset Research and Recovery division's business was the analysis of records on behalf of clients to determine whether any funds owing to the client relating to its security holdings had been mistakenly paid to or retained by a third party. Upon identification of any such funds, the Asset Research and Recovery division prepared claims documenting the client's entitlement to the funds and caused the claims ("Streetside Claims") to be submitted to the third party for payment. *Id.*

The Asset Research and Recovery division typically was paid on a contingent fee basis, receiving 30% of any funds recovered for its clients from Escheatment, Pre-escheatment or Streetside Claims. *Id.*

### The $2 Million Escrow Payment for 1995 Performance

Under the Purchase Agreement, FCI shareholders were entitled to a $2 million payment from the escrow account con-

trolled by Defendant Fasciana if the GFMG realized $1.17 million in net revenue for the final eight months of 1995. The Indictment alleges that Defendants and others defrauded EDS by fraudulently representing to EDS that the GFMG had met that performance target. The Indictment further alleges that the Defendants perpetrated this fraud by taking "dead" Pre-escheatment items (*i.e.*, items that the Asset Research and Recovery division had already reviewed and found appropriate for future escheatment) relating to the Asset Research and Recovery division's client Kidder Peabody ("Kidder") and Kidder's parent, GE Capital ("GECC"), and booking revenue relating to those items as if they were valid pre-escheatment claims.

The Indictment alleges that this fraud was accomplished as follows: Reddy instructed EDS employees to create a list of more than $7 million of the "dead" items and to record as GFMG income for 1995 75% of the fee that EDS would have earned if these Pre-escheatment claims had in fact been valid, or approximately $1.6 million. Reddy did this knowing full well that the Pre-escheatment claims on the list were not valid. The Indictment alleges that Reddy knew that EDS could not document ownership of the funds, and that the funds should have been escheated to the State of Delaware. *Id.* ¶ 15–17. By booking this $1.6 million in additional revenue in December 1995, Reddy boosted the GFMG's performance figures sufficiently to make it appear to have met its performance target specified in the EDS–FCI purchase agreement. Because, as of December 1995, EDS had not completed all of the work necessary to establish Kidder's ownership of the funds, it was, however, improper to recognize as 1995 income the fees attributable to those Pre-escheatment Funds. *Id.* ¶ 18. Based on the reported performance and pursuant to its obligations under the Purchase Agreement,

EDS authorized Fasciana to pay the FCI shareholders the 1995 performance payment of $2 million, plus interest, from his escrow account. *Id.* ¶ 19.

The Indictment alleges that, in order to conceal the improper accrual of $1.6 million in revenue Reddy, with the assistance of Fasciana, attempted in 1996 to convince Kidder and GECC to approve the $7 million in Pre-escheatment claims on the list, move those funds from the Pre-escheatment accounts to the Kidder/GECC accounts, and pay a 30% fee to EDS as if these were valid Pre-escheatment claims. *Id.* ¶ 20–21. As part of that effort, Reddy falsely told Kidder and GECC, in substance, that EDS's expert personnel had determined that the items should not have been earmarked for escheatment and that, where records were incomplete, Kidder and GECC should take the items back into income because there was "enough information, documented patterns of behavior and knowledge of street practice" to conclude that they should not have been earmarked for escheatment in the first place. The Indictment asserts that, because EDS's personnel had researched these items and in fact determined that they were proper Pre-escheatment items, "reasonable business judgment and street practice, as well as Delaware law" actually required Kidder and the GECC to escheat the funds. *Id.* ¶ 21.

### The 1997 $5 Million ICP Payment

In the Indictment, the Government alleges that the Defendants and others allegedly defrauded EDS by fraudulently representing to EDS that the GFMG had met the 1997 year-end performance targets under the ICP, and therefore that the key employees included in the ICP had earned a $5 million payment when, in truth and in fact, the GFMG had not met its performance targets in 1997, and the employees

therefore were not entitled to share in the $5 million ICP payment.

The Government asserts in the Indictment that, as the end of 1997 approached, it became clear to Reddy that the GFMG would not meet the ICP performance targets for 1997, and therefore that the key employees would not receive the $5 million payment available under the ICP for 1997. Rather than truthfully report to EDS that the GFMG had not met its performance targets, Reddy and others decided to record as revenue approximately $7 million that the GFMG had not earned. The anticipated revenues related to work the Asset Research and Recovery division was performing for Cigna Investments, Inc. and Prudential Investments. By year-end 1997, Asset Research and Recovery had only identified potential claims for those clients; it had not completed the research on those potential claims for those clients to determine if they were valid and none of the claims had been submitted for payment. Because the work necessary to substantiate the potential claims had not been completed in 1997, the Indictment alleges, it was not proper under EDS's accounting rules and generally accepted accounting principles ("GAAP") for the GFMG to record as 1997 income revenues associated with these potential claims, *Id.* ¶ 25.

Notwithstanding the fact that the GFMG had not earned revenue relating to these potential claims, Reddy and others decided to book approximately $7 million in 1997 revenue relating to these claims so that it would appear (falsely) that the GFMG had met its performance targets for year-end 1997. As a result, EDS made the $5 million ICP payment to the key employees of the GFMG. *Id.* (Reddy's share of the payment amounted to approximately $3.6 million).

To conceal the improper 1997 recording of income associated with these potential Cigna and Prudential claims, Reddy and Fasciana instructed the head of the Asset Research and Recovery division to "substitute" later-researched valid claims for the improperly booked claims. Thus, during 1998, the GFMG substituted valid claims that it had identified in 1998 for the invalid claims improperly booked for 1997, making it appear that income earned in 1998 was really earned in 1997. *Id.* ¶¶ 26–28.

*Fraudulent Escrow Claim Relating to Pre–Acquisition Receivables*

In November 1996, more than $500,000 of the Pre–Acquisition Receivables remained uncollected, and a corresponding amount of money remained in the escrow account, held by Defendant Fasciana, that had been established when EDS purchased FCI. Under the Purchase Agreement, these funds were to remain in escrow or revert to EDS unless the GFMG recovered receivables that were outstanding on the books of FCI at the time of the purchase.

The Indictment charges that, from about November 1996 to February 1997, Defendants Reddy, Fasciana and Amato falsely made it appear that they had collected approximately $111,870 of the Pre–Acquisition Receivables by making it appear that a check from a post-acquisition client was actually a payment in respect of a Pre–Acquisition Receivable. By so doing, they fraudulently induced EDS to authorize Fasciana to release approximately $111,870 from the escrow account to the FCI shareholders. *Id.* ¶ 29.

By late 1997, more than $350,000 in Pre–Acquisition Receivables remained uncollected and a corresponding amount of money remained in the Fasciana escrow account. The Indictment charges that Defendants Reddy and Fasciana deceived EDS into believing they had collected the Pre–Acquisition Receivables. According

to the Indictment, Defendants Fasciana and Reddy laundered, through Fasciana's bank accounts, more than $350,000 that EDS had received from other sources, and then represented to EDS that the funds were attributable to the collection of Pre–Acquisition Receivables. Based on Reddy and Fasciana's false representations, EDS approved the release of approximately $350,000 from the escrow account to the FCI shareholders. *Id.* ¶ 30.

## DISCUSSION

*Defendants' Request For a Bill Of Particulars*

■ Under Rule 7(f) of the Federal Rules of Criminal Procedure, a defendant may seek a bill of particulars in order to permit the defendant to "identify with sufficient particularity the nature of the charge pending against him, thereby enabling the defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.1987); *see also United States v. Torres*, 901 F.2d 205, 234 (2d Cir.1990). In their request for a bill of particulars, Defendants ask the Government to (i) identify the GAAP and EDS accounting rules, "street practices," principles of "business judgment" and provisions of Delaware law Defendants are alleged to have violated, (ii) to specifically identify each of the false claims and fraudulent documents referred to in the Indictment, (iii) to identify parties referred to, but not identified, in the Indictment, and (iv) to provide particulars regarding the "assistance" of Defendant Fasciana as alleged in the Indictment.

■ The decision whether to order the filing of a bill of particulars rests within the sound discretion of the district court. *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir.1999) (citing *United States v. Barnes*, 158 F.3d 662, 665–66 (2d Cir. 1998)). "In exercising that discretion, the court must examine the totality of the information available to the defendant—through the indictment, affirmations, and general pre-trial discovery—and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Bin Laden*, 92 F.Supp.2d 225, 233 (S.D.N.Y.2000).

■ "Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574. The prosecution generally need not particularize all of its evidence, so long as the defendant is adequately informed of the charges against him. *Torres*, 901 F.2d at 234; *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir.1988). "The proper scope and function of a bill of particulars is not to obtain disclosure of evidence or witnesses to be offered by the Government at trial . . . ." *United States v. Strawberry*, 892 F.Supp. 519, 526 (S.D.N.Y.1995) (citing *United States v. Salazar*, 485 F.2d 1272, 1278 (2d Cir.1973)). However, if necessary to give the defendant enough information about the charge to prepare his defense, a bill of particulars will be required even if the effect is disclosure of the Government's evidence or theories. *Barnes*, 158 F.3d at 665. In addition, the Second Circuit has made clear that the Government does "not fulfill its obligations merely by providing mountains of documents to defense counsel who were left unguided" as to the nature of the charges pending. *Bortnovsky*, 820 F.2d at 575; *accord Bin Laden*, 92 F.Supp.2d at 234 ("It is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the

large volume of material disclosed is precisely what necessitates a bill of particulars.").

### Accounting Rules

 Defendants seek information concerning the specific GAAP provisions, EDS accounting rules, "street practices" and principles of "business judgment" and Delaware law provisions referred to in the Indictment, contending that the Indictment is insufficiently specific as to how those principles were allegedly violated. As noted above, Rule 7(f) permits a defendant to seek a bill of particulars in order to gain sufficiently particularized knowledge of the charges against him to enable him to prepare his defense and to plead double jeopardy if the need should later arise. A bill of particulars specifying the GAAP and accounting rules allegedly violated by the income recognition scheme described in the Indictment is not necessary because the criminal conduct charged in the Indictment does not consist of violations of GAAP, EDS accounting rules, "reasonable business judgment," "street practice," or principles of "business judgment" per se. Rather, the Indictment charges Defendants with defrauding EDS by, among other things, causing the GFMG to reflect on its books Pre-escheatment claim income that it had not yet earned, thereby triggering fraudulently performance-related payments under the Purchase Agreement and the ICP.

For example, in paragraph 17 of the Indictment, the Government alleges Defendant Reddy asserted that Kidder was the rightful owner of certain potential Pre-escheatment claims, even though "EDS could not document Kidder's supposed ownership of these funds, Kidder was obligated under Delaware law to escheat these funds to Delaware, and EDS was not entitled to any fee." *Id.* ¶ 17. Essentially,

paragraph 17 of the Indictment alleges that Defendant Reddy knew that EDS could not establish that Kidder owned $7 million in funds that should have been escheated to Delaware.

In paragraph 18 of the Indictment, Government alleges that "[a]s of December 1995, EDS had not completed all work necessary to establish Kidder's ownership of approximately $7 million in pre-escheatment funds, and therefore under EDS's accounting rules and [GAAP], it was not proper to recognize income in 1995 for EDS' fees for potential claims that might be asserted by GECC and Kidder to these funds." *Id.* ¶ 18. Paragraph 18 further alleges that Defendant Reddy concealed from EDS that Kidder's ownership of approximately $7 million in Pre-escheatment Funds had not been established and that Defendant Reddy improperly recorded as income earned in 1995 75% of the value of EDS's fee or approximately $1.6 million. The gravamen of paragraph 18 is that Defendant Reddy fraudulently recorded the $1.6 million as income in 1995 based on unsubstantiated claims, thereby triggering an escrow release to which the former FCI shareholders were not entitled.

In paragraph 25 of the Indictment, the Government alleges that EDS had not completed in 1997 its investigation into the status of certain claims which were recorded as 1997 income. Thus, "under EDS's accounting rules and GAAP, it was not proper to record income in 1997 associated with these potential claims." *Id.* ¶ 25. Inclusion of these amounts, according to the Indictment, triggered improper escrow payments. The gravamen of paragraph 25 is that Defendant Reddy decided to record as income in 1997 approximately $7 million, representing EDS' share of $20 million in potential claims, knowing that the claims had not been fully substantiated

and that they should not have been recorded as income in 1997.

In paragraph 21 of the Indictment, the Government alleges that Defendant Reddy made a series of false statements to Kidder, GECC and their counsel to the effect that EDS personnel had reviewed $7 million worth of items and concluded certain items had been "inappropriately credited to the pre-escheatment account," that, as to items for which there was insufficient documentation, when "records were not available ... street practice, patterns of behavior, reasonable business judgment and available records prevail," and that "there was enough information, documented patterns of behavior and knowledge of street practice [regarding the incomplete items] to recover those monies from the pre-escheatment account and take them back into income." *Id.* ¶ 21. This reference to "reasonable business judgment" and "street practice" merely purports to parrot Defendant Reddy's own alleged false statements and does not charge Defendant Reddy with violating principles of "reasonable business judgment" or "street practice." Paragraph 21 goes on to assert that the relevant EDS personnel in fact had determined that there was not a sufficient basis for Kidder to claim the funds and that "[i]n these circumstances, reasonable business judgment and street practice, as well as Delaware law, required Kidder to escheat the funds to Delaware." *Id.* Again, the gravamen of the allegation is fraud accomplished by improper recognition of unearned income, not a substantive charge of violation of particular business principles or state law. Indeed, the second reference to "reasonable business judgment" and "street practice" in this paragraph appears to be a retort to Defendant Reddy's alleged assertion.

In each of the foregoing paragraphs of the Indictment, the Government's references to GAAP, EDS accounting rules, "reasonable business judgment," "street practice" or Delaware law add detail to the Government's allegation that Defendant Reddy knew that certain pre-escheatment claims should not have been booked as income and that he falsely represented the ownership of the funds. They do not constitute charges of criminal violations in and of themselves. In this respect they are distinguishable from the rules and regulations at issue in the cases relied upon by Defendants. In *United States v. Mango*, No. 96 Cr. 327, 1997 WL 222367 (N.D.N.Y. May 1, 1997), the indictment counts at issue charged the defendants with numerous violations, potentially widespread in time and geography, of a United States Army Corps of Engineers permit. A provision of the Clean Water Act made criminal violation of "any requirement" of such a permit. *Mango*, 1997 WL 222367, at \*3–\*4.

The charge in question in *United States v. Hunter*, 843 F.Supp. 235 (E.D.Mich. 1994), was falsification of entries in records required to be maintained by Federal Treasury regulations. The indictment did not specify the regulations that imposed the record keeping requirement. *Hunter*, 843 F.Supp. at 253. The defendants in *United States v. Madeoy*, 652 F.Supp. 371 (D.D.C.1987), were charged with violating "unspecified laws and regulations of the United States" in an indictment one count of which "[referred] to more than 700 pages of the Code of Federal Regulations without specifying which regulations [were] at issue." *Madeoy*, 652 F.Supp. at 374. Here, counts one through ten, which incorporate the accounting, legal and business practice references as to which defendants seek further specificity, cite the particular provisions of federal law alleged to have been violated (*i.e.*, 18 U.S.C. §§ 371, 1341, 1343 and 1346). The controversy in *United States v. Bell*, No. 00 Cr. 92(KMW)

(S.D.N.Y. endorsed order dated May 2, 2001), appears to have revolved around characterizations of specific types of procedures for Medicare billing purposes. According to the submission on which Judge Wood endorsed her ruling in that matter, the government charged that all of defendant's "hydrotherapy" billings for treatments involving water were fraudulent while failing to identify the regulations laws or guidelines underlying its classification of the treatments.

The Court finds that the Indictment sufficiently describes the charge against Defendants such that a bill of particulars specifying the GAAP rules, EDS accounting rules, or which principles of "reasonable business judgment," "street practice," or provisions of Delaware law referred to in the Indictment is not warranted.

*Particulars Regarding "False Claims" and "Fraudulent Documents"*

Defendants request that the Government be directed to identify each of the false claims and fraudulent documents referred to in the Indictment. Defendants argue that they cannot adequately prepare a defense without knowing which claims and documents found in the Government's voluminous document production have been allegedly falsified. The Court's inquiry in this connection focuses on whether the Indictment contains the information necessary to enable Defendants to prepare for trial and not be subject to surprise. *United States v. Savin,* No. 00 Cr. 45, 2001 WL 243533, at *4 (S.D.N.Y. Mar.7, 2001) (citing *Bortnovsky,* 820 F.2d at 574 and *United States v. Nachamie,* 91 F.Supp.2d 565, 574 (S.D.N.Y.2000)); *Torres,* 901 F.2d at 234 (the prosecution is not required to particularize all of its evidence, so long as the defendant is adequately informed of the charges against him).

The Court finds that, except in one respect, the Indictment contains the information concerning false statements and fraudulent documents necessary to enable Defendants to prepare for trial. For example, in respect of the $2 million payment made under the terms of the Purchase Agreement for 1995 performance, the Indictment alleges creation of a list of more than $7 million in Pre–Escheatment claims taken from a "dead" pile and that the GFMG's year end 1995 income figures were inflated by an amount equal to 75% of what would have been EDS's fee on those claims had they been valid ones. *Id.* ¶¶ 17, 19. The Indictment further identifies the claims in question as ones that EDS personnel had already reviewed and determined to be invalid. *Id.* ¶ 18. Further specificity as to allegedly false claims underlying the 1995 performance payment is provided in paragraph 23, which asserts that items on the original list were taken off as their rightful owners claimed them and that newly identified potential claims were substituted for those items. The Indictment thus indicates that the false claims consisted of those on the list and include claims for which later claims were substituted after the close of the year. The Indictment also alleges specific overt acts, with dates and descriptions of documents or statements made by the Defendants relating to the payment for 1995 performance. *Id.* ¶¶ 35a, 35b, 35c, 35d, 35e, and 35f.

As to the $5 million payment made to EDS in respect of 1997 performance, the Indictment identifies a group of Cigna and Prudential potential claims, totaling more than $20 million, for dividend and interest payments on securities that were under EDS's review as of the close of 1997 and were used as the basis for EDS's recognition of more than $7 million in unearned income. *Id.* ¶ 25. The Indictment further identifies the fraudulent underlying 1997 claims by alleging that certain of the

claims were "replaced" in 1998 when they proved invalid. *Id.* ¶¶ 26–27. The Indictment describes how Defendants Reddy and Fasciana allegedly instructed the Division Head of the Asset Research and Recovery Division of EDS to alter EDS's books so that "valid claims made in 1998 would appear to have been made in 1997, and invalid 1997 claims in corresponding dollar amounts would be erased from EDS's books." *Id.* ¶ 26.

As to the 1997 Pre–Acquisition Receivables payment, the Indictment again provides information sufficient to enable Defendants to identify the allegedly false claims. Paragraph 29 identifies the post-acquisition receipt by amount and alleges that it was used to support claims for that amount. Paragraph 35*o*-hh details check amounts, entries and payees in connection with 1997 and 1998 Pre–Acquisition Receivables claims.

The Court finds with respect to the 1995 and 1997 performance payments, as well as the Pre–Acquisition Receivables payments, that the Indictment sufficiently identifies, by time-frame and description, categories of documentation and related claims or statements that are alleged to be false. Thus, this case is unlike *United States v. Bortnovsky*, 820 F.2d 572, where the indictment alleged generally that false insurance claims had been made, only a small proportion of the claims identified by the government were, in fact, false and the government's failure to identify specifically the alleged false claims in effect forced the defendants to prove the propriety of the remainder, and *United States v. Nachamie*, 91 F.Supp.2d 565, where the court ordered a bill of particulars to assist in sorting through over 200,000 pages of Medicare claims, not all of which had allegedly been falsified. Here, the Indictment contains lists of claims, identifies classes of claims, and, in many cases, specific partic-

ular documents or transactions, tying them to particular periods of time and compensatory transactions.

In light of the above, the Court finds that the Indictment, along with the discovery already provided, apprises the Defendants of the charges against them with sufficient precision to enable them to prepare a defense and avoid unfair surprise at trial. Accordingly, the Defendants' request for a bill of particulars identifying each of the false claims and fraudulent documents referred to in the Indictment is denied, except as set forth below.

■ One aspect of the Indictment does, however, appear insufficient in this regard. Paragraph 28 of the Indictment alleges that, to generate sufficient 1998 claims to substitute for invalid 1997 claims and "still to approach 1998 targets," the "Division Head" directed the creation of fraudulent claims to the states of New York and Massachusetts for the return of abandoned property that did not in fact belong to EDS clients. The Indictment provides no further facts with respect to this allegation. A previously sealed affidavit submitted by the Government in support of a search warrant application indicates that the allegedly fraudulent claims constituted fewer than all of the claims submitted to those states ("substantially all" of the claims EDS caused to be submitted to Massachusetts on GE Investments' behalf were fraudulent; approximately $15 million of the $17 million to $19 million in claims submitted to New York in 1998 were fraudulent). Affidavit of Special Agent Kathleen Diskin, Exh. B to the Fink Affidavit, ¶¶ 16, 21–22. This information, like the generalized allegations addressed by the Second Circuit in *Bortnovsky,* is insufficient to enable defendants to understand and prepare their defense in this regard.

Accordingly, the Government shall within thirty (30) days deliver a bill of particulars specifying the fraudulent claims to Massachusetts and New York that are referred to in paragraph 28 of the Indictment.

*Particulars Concerning the Identity of Persons Referred to in the Indictment*

 Defendants argue that the Indictment lacks sufficient information concerning the identity of individuals who were involved with the Defendants' alleged wrongdoing. In evaluating such requests, courts have considered such factors as: (i) the number of co-conspirators; (ii) the duration and breadth of the alleged conspiracy; (iii) whether the Government otherwise has provided adequate notice of the particulars; (iv) the volume of pretrial discovery; (v) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (vi) the potential harm to the Government investigation. *United States v. Lino*, No. 00 Cr. 632, 2001 WL 8356, at *12 (S.D.N.Y. Dec.29, 2000) (citing *Nachamie*, 91 F.Supp.2d at 572); *Savin*, 2001 WL 243533, at *5.

 Defendants contend that the Indictment does not identify persons who allegedly participated in the acts alleged in the Indictment and is thus lacking in essential specifics to enable Defendants to adequately prepare for trial. *See* Defendants' Brief at 20–21. Courts have granted requests for bills of particulars identifying co-conspirators in cases where the number of defendants was large, where the alleged conspiracy spanned long periods of time and where the alleged schemes were wide-ranging. *See Savin*, 2001 WL 243533, at *5 (bill of particulars granted where number of co-conspirators "quite large" and conspiracy may have spanned six years); *Lino*, 2001 WL 8356, at *13 (bill of particulars granted where conspiracy involved large number of defendants,

was wide-ranging in terms of the nature of the acts and the commerce affected and defendants were likely to be surprised by the identity of the other co-conspirators); *Nachamie*, 91 F.Supp.2d at 572–73 (bill of particulars identifying co-conspirators appropriate in case where defendant "is more likely to be surprised by the identity of other co-conspirators, whom he may never have met"); *United States v. Failla*, No. 93 Cr. 294, 1993 WL 547419, at *7 (E.D.N.Y. Dec.21, 1993) (RICO action alleging a conspiracy spanning a long period of time); *United States v. Feola*, 651 F.Supp. 1068, 1132 (S.D.N.Y.1987), *aff'd*, 875 F.2d 857 (2d Cir.1989) (involving numerous defendants). The Second Circuit, however, has refused to find an abuse of discretion where such requests have been denied. *See Torres*, 901 F.2d at 233–34.

In this case, the number of defendants is small, the duration of the alleged acts was not long and the number of unnamed co-conspirators or parties allegedly assisting in the wrongdoing does not appear to be so large such that there is not much likelihood that Defendants would be surprised by the identity of these persons. Indeed, all of the charged transactions involve financial dealings in which a limited number of persons had an interest and as to which most, if not all, relevant information would have been confined to the Defendants and/or persons who reported to one or more of them directly or indirectly. Accordingly, identification of the persons referred to in the Indictment is not necessary in order for Defendants to adequately prepare for trial and Defendants' request for particulars identifying unnamed persons referred to in the Indictment is denied.

*Particulars Concerning Fasciana's Assistance*

Defendants seek particulars concerning the manner in which Defendant Fasciana

allegedly assisted Defendant Reddy in connection with certain of the acts described in the Indictment. The request for a bill of particulars in this regard is denied. The Indictment provides sufficient detail to inform Defendants of the charges against them. Because the Indictment sets forth in sufficient detail the dates, the type of transactions and the dollar amounts involved, Defendant Fasciana has been provided with adequate notice of the charges against him. Further information concerning the manner in which Fasciana allegedly assisted Defendant Reddy is not necessary in order to enable Defendants to prepare for trial. This request appears to seek "evidentiary detail beyond what is required to provide adequate notice of the charges." *See Savin,* 2001 WL 243533, at *6.

*Request for Identification of Documents the Government Intends to Use in its Case–In–Chief*

Defendants request that the Government identify, pursuant to Rule 16(a), which documents produced in discovery that it intends to use at trial, including those documents that will be relied upon or referred to in its case-in-chief. Rule 16(a) provides, in pertinent part:

> Upon request of the defendant the government shall permit the defendant to inspect and copy ... documents ... which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

Fed. R. Cr. P. 16(a)(1)(C). Defendants contend that the Government has not complied with Rule 16(a)(1)(C) because it has produced over 250,000 pages of documents, but has not indicated which of those documents it intends to rely on to present its case-in-chief at trial. It is clear that Rule 16(a)(1)(C) does not require the Government to identify specifically which documents it intends to use as evidence. It merely requires that the Government produce documents falling into the three enumerated categories. *Nachamie,* 91 F.Supp.2d at 569.

Courts disagree as to whether the court nonetheless has discretion under Rule 16 to direct the Government to identify the documents it intends to rely upon in its case in chief. *Compare Nachamie,* 91 F.Supp.2d at 568–570 and *Savin,* 2001 WL 243533, at *6 with *Lino,* 2001 WL 8356, at *19 (and cases cited therein).

Whether or not the Court has authority to order the Government to designate immediately the evidence it intends to use in its case in chief, the Court finds no basis for doing so here. While this case is document-intensive, that circumstance is consistent with the nature of the alleged fraud. Furthermore, as explained above, the Indictment sets forth sufficiently the charges against Defendants by describing the fraudulent claims and documentation underlying those claims, including the dates, the types of transaction and dollar amounts involved. The Government has indicated that it intends to make its exhibits available for inspection consistent with its production pursuant to 18 U.S.C. section 3500. The Court finds that such disclosure is sufficient under the circumstances to promote an orderly trial.[2] *Cf.*

---

**2.** The Government indicates that it intends to disclose its section 3500 material the Thursday of the week before a witness's testimony. Given the complexity of the issues, the projected length of the trial and the substantial preparation period the current trial schedule affords the Government, the Government is encouraged to make disclosure of all of its exhibits no later than Monday of the week preceding the anticipated testimony.

*United States v. Palermo*, No. 99 Cr. 1199, 2001 WL 185132, at *6 (S.D.N.Y. Feb.26, 2001) (court approved Government's practice of identifying Rule 16(a)(1)(C) materials that it intended offer a certain number of days prior to calling its witnesses).

### The EDS Investigatory File

Defendants request that the Government produce files from EDS's internal investigation into the operations of the GFMG. The Government's obligations in respect of the EDS Investigatory file are governed by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Rule 16(a)(1)(C) and the Jencks Act (18 U.S.C.A. § 3500 (West 2001)). Accordingly, to the extent the Government possesses files from the EDS's internal investigation that contain material exculpatory or impeachment evidence (*Brady* material), documents that are material to the preparation of defendant's defense, intended for use by the Government as evidence in chief at trial, or obtained from the defendant (Rule 16 material), or statements by Government witnesses or prospective Government witnesses (Jencks Act material), such evidence must be produced in a manner consistent with the timetables applicable to such categories of disclosures.

The Government indicates that it has produced "all the documents in the Government's possession which EDS gathered in its investigation and which are related to the issues in this case." Government's Brief in Opposition, at 36. In addition, the Government asserts that it has produced "the written correspondence between the [D]efendants and the EDS investigators." *Id.* at 37. The Government asserts that it withheld from its Rule 16(a)(1)(C) production two categories of documents: "(1) witness statements obtained by EDS's investigators; and (2) the work product of EDS's investigators, such as documents created by EDS's investigators during the

course of the investigation setting forth the investigator's analysis of the evidence they had gathered." *Id.* The Court assumes, in light of the Government's description of its production, that it has not withheld material intended to be used in its case in chief and that all elements of the file that were obtained from or belong to Defendants have been turned over. *Cf.* Fed.R.Crim.P. 16(a)(1)(C). The issue thus before the Court is whether the withheld portions of the file constitute evidence material to the preparation of the Defendants' defense within the meaning of Rule 16(a)(1)(C).

The Second Circuit has defined such material evidence as follows:

> Evidence that the government does not intend to use in its case in chief is material if it could be used to counter the government's case or to bolster a defense; information not meeting either of those criteria is not to be deemed material within the meaning of the Rule merely because the government may be able to use it to rebut a defense position.... Nor is it to be deemed material merely because it would have dissuaded the defendant from proffering easily impeached testimony.

*United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir.1993). "Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case." *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir.1991) (quoting *United States v. Ross*, 511 F.2d 757, 762–63 (5th Cir.1975)) (further citation omitted). Evidence is "material" for purposes of Rule 16(a)(1)(C) if pretrial disclosure will enable the defendant "significantly to alter the quantum of proof in his favor." *See id.; see also United States v. McGuinness*, 764 F.Supp. 888, 895 (S.D.N.Y.1991).

■ "Before the government can be required to produce evidence under Rule 16(a)(1)(C) on the grounds that it is material to the defense, it is incumbent upon the defendant to make a prima facie showing of materiality." *McGuinness*, 764 F.Supp. at 894 (internal quotations omitted) (collecting cases); *see Maniktala*, 934 F.2d at 28. "To establish a showing of materiality, a defendant must offer more than the conclusory allegation that the requested evidence is 'material.' " *United States v. Walker*, No. 96 Cr. 736, 1997 WL 327093, at *2 (S.D.N.Y. June 12, 1997). Where the defendant "has not specified what he is looking for in [the files], why he expects it to be there, and what use he intends to make of the information," defendant has failed to make the required prima facie showing of materiality. *Id.* (quoting *United States v. Ashley*, 905 F.Supp. 1146, 1169 (E.D.N.Y.1995)).

Defendants argue simply that the EDS investigatory files are material to their defense because the EDS investigation provided the basis of the criminal charges against the Defendants. The Defendants have not met their burden. As the Government points out, the Defendants have not indicated how the opinions, conclusions and analysis of the investigators meet the materiality standard under Rule 16(a)(1)(C), in other words, how such materials could help the Defendants to counter the Government's case, bolster their defense, or otherwise alter significantly the quantum of proof in their favor. *See Stevens*, 985 F.2d at 1180; *Maniktala*, 934 F.2d at 28; *McGuinness*, 764 F.Supp. at 895.

With respect to the statements from potential witnesses in the EDS investigatory file, the Government maintains that most of the statements are by individuals that the Government intends to call upon to testify at trial. The Government believes the remaining statements are from witnesses who were not involved in the events at issue in this case and are not material under Rule 16. Government's Brief in Opposition, at 37. The Government further indicates that it intends to review further the EDS witness statements and make final determinations as to the witnesses it intends to call at trial. Any such statements will be produced to Defendants. *Id.* at 37, n. 16.

As explained herein, to the extent the Government has in its possession witness statements from the EDS investigatory file from persons that it does not intend to call to testify at trial and such statements constitute *Brady* material, they must be produced in a manner consistent with the timetable applicable for *Brady* disclosure. To the extent statements from potential witnesses in the EDS investigatory file were obtained from persons the Government intends to call as witnesses, they are outside the scope of Rule 16(a)(2) and subject to the disclosure requirements of 18 U.S.C. § 3500.[3] *See infra* p. 575. In light of the foregoing, Defendants' request for the withheld portion of the EDS investigatory file is denied except to the extent such portion contains *Brady* or Jencks Act material. Production of *Brady* or Jencks Act portions of the EDS investigatory file shall be made in a manner consistent with the discussion herein.

*Brady Material*

■ Defendants request that the Government produce immediately all exculpatory materials under *Brady v. Mary-*

---

**3.** Rule 16(a)(2) provides, in pertinent part: "Information not subject to disclosure.... Nor does the rule authorize the discovery or inspection of statements made by government witnesses or prospective government witnesses except as provided in 18 U.S.C. § 3500."

*land,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under *Brady,* the Government is obligated to provide favorable evidence to the defense where the evidence is material to guilt or punishment. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *United States v. Coppa,* 267 F.3d 132, 139 (2d Cir.2001). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *Id.* (citing *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Coppa,* 267 F.3d at 142; *see also Kyles v. Whitley,* 514 U.S. 419, 434–37, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Zagari,* 111 F.3d 307, 319–20 (2d Cir.1997); *United States v. Gonzalez,* 110 F.3d 936, 943–44 (2d Cir.1997); *Tinsley v. Kuhlmann,* 973 F.2d 163, 166 (2d Cir.1992). Only evidence that is material as defined by the reasonable probability test set forth in *Bagley* must be disclosed under *Brady. See Coppa,* 267 F.3d at 141 ("the current *Brady* law ... imposes a disclosure obligation narrower in scope than the obligation to disclose *all* evidence favorable to the defendant") (citing *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995))(internal quotation marks omitted).

 As a general rule, *Brady* does not require immediate disclosure of material exculpatory evidence and impeachment material upon defendant's request. *Coppa,* 267 F.3d at 146. "There is no *Brady*

violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial." *Coppa,* 267 F.3d at 144; *United States of America v. Jacques Dessange, Inc.,* No. 99 Cr. 1182, 2000 WL 280050, at *9 (S.D.N.Y. March 14, 2000) ("[t]he essence of the *Brady* obligation is that the defendant be provided with the exculpatory information on a schedule to use it effectively at trial."). In *Coppa,* the Second Circuit defined the standard for the timing of *Brady* disclosures as follows: "[T]he prosecutor must disclose 'material' (in the *Agurs/Bagley* sense) exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made." *Coppa,* 267 F.3d at 142. Accordingly, "as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Coppa,* 267 F.3d at 144. Moreover, it is the government's responsibility to determine what evidence is material and when such evidence should be disclosed in time for its effective use. *See Coppa,* 267 F.3d at 143 ("The prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached.") (citing *Kyles v. Whitley,* 514 U.S. at 437, 115 S.Ct. 1555).

Trial of this matter is not scheduled to begin for more than nine months. Defendants have not shown that general *Brady* disclosure so far in advance of the trial is necessary to ensure due process of law and Court sees no reason to so conclude. The Government's ultimate production of material exculpatory and impeachment evidence, however, must be timed so as to

enable the Defendants to use the material effectively at trial.

 In addition, as discussed previously, Defendants argue that the Government should produce as *Brady* material statements from EDS employees who may have provided exculpatory information to the EDS investigators. The Government must disclose information to the defendant to insure that the defendant will not be denied access to exculpatory evidence known only to the Government. *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir.1982); *see also Tate v. Wood*, 963 F.2d 20, 25 (2d Cir.1992). As noted above, the scope of disclosure required by *Brady* and its progeny is limited to such evidence the suppression of which would be likely to affect the outcome of the proceeding or to undermine confidence in that outcome. *Coppa*, 267 F.3d at *144. The Government is not obligated to disclose its investigative files merely because they contain information which could assist the defendant. *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993); *LeRoy*, 687 F.2d at 618; see also *United States v. Agurs*, 427 U.S. 97, 109, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Furthermore, exculpatory and material evidence is not required to be disclosed under *Brady* if the defendant knows or should have known of "the essential facts permitting him to take advantage of any exculpatory evidence." *Zackson*, 6 F.3d at 918 (internal quotation omitted). *See also Zagari*, 111 F.3d at 320; *Gonzalez*, 110 F.3d at 944.

 In fulfilling its obligations under *Brady*, the Government may direct the Defendants' attention to any witnesses who may have material exculpatory evi-

dence. Once the Defendants are aware of the existence of such witnesses, the Defendants "may attempt to interview them to 'ascertain the substance of their prospective testimony,' or subpoena them if the Government does not intend to call them as witnesses at trial." *Jacques Dessange, Inc.*, 2000 WL 280050, at *8 (citing *United States v. Ruggiero*, 472 F.2d 599, 605 (2d Cir.1973)).

*Early Production of Giglio and 18 U.S.C. Section 3500 Materials*

 Defendants requests that the Court direct the Government to immediately provide *Giglio* material[4] and section 3500 (Jencks Act) materials. In *Coppa*, the Court of Appeals for the Second Circuit made clear that the timing requirement for disclosure of *Giglio* material is the same as that for exculpatory materials required to be disclosed under *Brady*. See *Coppa*, 267 F.3d at 139. In other words, *Giglio* material must be disclosed in time to permit its effective use at trial. *Id.* at 146. Thus, just as the Government has no obligation to provide *Brady*-type material exculpatory evidence on Defendants' demand, the Government has no obligation to provide *Giglio*-type impeachment material on Defendants' demand. As is the case with *Brady* material in general, it is the Government's responsibility to determine what *Giglio* evidence is material and when such evidence must be disclosed to permit its effective use.

With respect to section 3500[5] materials, the Court in *Coppa* made clear that unless witness statements are material in the *Brady* sense, they are not subject to required disclosure outside the requirements of section 3500. See *Coppa*, 267 F.3d at

---

4. *Giglio* material refers to evidence useful to impeach the credibility of Government witnesses. *See Coppa*, 267 F.3d at 139. The *Giglio* requirement is limited to such evidence

that is material in the *Brady* sense. *Coppa*, 267 F.3d at 135.

5. *See* 18 U.S.C.A. § 3500 (West 2001).

146. Accordingly, the Government is not required to produce section 3500 materials other than as required by the statute, unless such statements are material within the meaning of *Brady*. In such case, the Government must produce material witness statements in time to permit their effective use at trial. *Id.*

*Federal Rule of Evidence 404(b) Materials*

Defendants request that the Court direct the Government identify evidence sixty days before trial, that may be proffered pursuant to Fed.R.Evid. 404(b). Rule 404(b) provides, in pertinent part:

> [e]vidence of other crimes, wrongs, or acts ... may ... be admissible ... provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial ... of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b).

 What constitutes reasonable notice depends upon the circumstances of the particular case. *See United States v. Kevin*, No. 97 Cr. 763, 1999 WL 194749, at *13 (S.D.N.Y. April 7, 1999) (collecting cases). The purpose of the notice provision is "to reduce surprise and promote early resolution" of any challenge to admissibility of the proffered evidence. Fed.R.Evid. 404(b), Advisory Committee's Note; *Lino*, 2001 WL 8356, at *22. "While notice is typically provided no more than two to three weeks before trial, a longer period is appropriate [where there is an] absence of any threat to the safety of prospective witnesses and the ... Rule 404(b) evidence [is important to] this action." *Nachamie*,

91 F.Supp.2d at 577 (internal citations and quotations omitted) (requiring Government to provide 404(b) material 30 days prior to trial).

A survey of the cases reflects, as might be expected, a range time periods determined by the courts to be reasonable notice for purposes of Rule 404(b) disclosure. In *Lino*, the court determined that sixty days notice was reasonable. In that case, however, the sixty day period was proposed by the Government. *See Lino*, 2001 WL 8356, at *22. In *United States v. Livoti*, 8 F.Supp.2d 246 (S.D.N.Y.1998), the court ordered Rule 404(b) disclosure 45 days before trial.[6] In *United States v. Yian*, No. 94 Cr. 719, 1995 WL 368445 (S.D.N.Y. June 21, 1995), the court ordered Rule 404(b) disclosure over 4 months prior to trial to permit expected motions in limine.[7] In *United States v. Aronson*, No. 98 Cr. 564, 1999 WL 97923 (S.D.N.Y. Feb.24, 1999), the court ordered Rule 404(b) disclosure a month prior to trial. In *United States v. Wilson*, No. 95 Cr. 688, 1997 WL 10035 (S.D.N.Y. Jan.10, 1997), thirty days notice was held sufficient.

 The Government contends that Rule 404(b) notice thirty days prior to trial constitutes reasonable notice under the circumstances of this case because the Government has yet to finalize its order of proof and does not yet know what facts may constitute 404(b) evidence. Defendants argue that should the Government make Rule 404(b) disclosure, Defendants will require time to interview witnesses and gather evidence to rebut the Government's proffer.

6. The Court takes judicial notice that the docket in that case reflects that the trial commenced on June 15, 1998. The court had ordered Rule 404(b) disclosure by May 1, 1998.

7. The Court takes judicial notice that the docket in that case reflects that the trial was initially set for November 13, 1995. The *Livoti* court had ordered Rule 404(b) disclosure by June 27, 1995.

In light of trial schedule in this case, the Court finds that Rule 404(b) disclosure 45 days prior to trial is appropriate, providing time for the Government to finalize its order of proof, for the parties to present and the Court to resolve *in limine* issues relating to Rule 404(b), and for Defendants to gather evidence in rebuttal.

### CONCLUSION

For the reasons stated above, Defendants' request for an order compelling the Government to file a bill of particulars identifying the specific GAAP and EDS accounting rules, "street practices," principles of "business judgment" and the provisions of Delaware law Defendants are alleged to have violated is denied. Defendants' request for a bill of particulars identifying each of the false claims and fraudulent documents referred to in the Indictment is denied, except that the Government shall within thirty (30) days deliver a bill of particulars specifying the fraudulent claims to Massachusetts and New York that are referred to in paragraph 28 of the Indictment. Defendants' request that the Government file a bill of particulars identifying parties referred to, but not identified in the Indictment is denied, and Defendants' request that the Government provide particulars regarding the "assistance" of Defendant Fasciana as alleged in the Indictment is denied. Defendants' request for an order directing the Government to identify all documents that it intends to rely on in its case-in-chief is denied. Defendants' request for an order directing the Government to supplement its Rule 16(a) production by producing the withheld portion of the EDS investigatory file is denied to the extent that such items are not required to be produced under *Brady, Giglio* or section 3500. Defendants' request for an order directing early production of *Brady, Giglio* and section 3500 materials is denied.

The Government is directed to make its Rule 404(b) disclosure 45 days prior to trial.

SO ORDERED.